16-2639, 16-2641, 16-2649 USA v. Zafar Mehmood 16-2639, 16-2641, 16-2649 oral arguments, 10 minutes for each defendant, 20 minutes for Mr. Belli and Mr. McConnell Good morning, your honors. Dennis Belli on behalf of defendant Zafar Mehmood, who appeals from multiple convictions for health care fraud, money laundering, I would like to reserve one minute of rebuttal time. One of the key issues in our appeal is what we feel is a violation of the Court Interpreters Act, and that's a statutory governed standard. On that subject, though, his conduct and behavior at the trial, he never raised it. You've got a problem with the fact that after some discussion in the beginning, nothing happened further and he didn't ask or appear to need any interpreter. You've got an uphill battle on that. Well, that's the government's position, and it's our argument that we have this very strict statutory procedure as far as what the district judge is supposed to do to obtain a waiver, because typically you're not going to have a record that the appellant can rely on to say, yeah, look here, here, the defendant did not understand this or did not understand that. Criminal defendants are told, sit there, behave, do not engage in outbursts, do not interject yourself, your attorney will do the talking. So the Court Reporters Act has this subsection F1, which states that in order... The lawyer here did not seek further to have an interpreter. That's true. That's his lawyer. I mean, he could ask his lawyer to do something. That is true, and we don't know whether he... I think you've probably got better points to make than this. Okay. Appreciate your candor, Judge. Well, again, it's our position that the statutory waiver procedure must be followed. I mean, the question is whether it was prejudicial, and you didn't even... They didn't even make a record below. I mean, nobody even raised it. But as Judge Mayer had said, it seems pretty clear that he understood and was able to communicate, and apparently they found it easier. So I do think you have better issues. Well, then I'd like to proceed to the third issue, which involves the admission of Exhibit 351, which is this scanned copy of a patient file, Jenny Drake. And that was the subject of a lot of controversy. The government was using this exhibit as its principal circumstantial piece of evidence that Mr. Mahmoud had engaged in obstruction of justice by secreting portions of the Drake file during the visit with his attorneys to the HHS offices to look at certain files. So the government argues, well, this is subject to 901 and Evidence Rule 901, and the standard of admissibility is very broad. And our position is that Evidence Rule 1003 applies. That deals with duplicates of originals, and we submit that there's a heightened standard of proof here. And we believe that, well, the rule says that if a genuine issue is raised about authenticity, the government has the obligation to establish the chain of custody. Actually, I'm quoting from the Knowles case of this court. Sorry, what? I lost what you said. Actually, I am paraphrasing the Knowles case of this court, which is cited in the brief. You're saying that he already had these documents in his cell and didn't steal them from the office where he asked to go. Yes, that was the defense, and there was testimony. The case agents agreed that there is a valid reason to have more than one copy of a patient file because Medicare occasionally will request additional documentation to support a claim, and the provider will keep Was it the exact things that were missing from the office there where he went? Well, that's the government's circumstantial case. They said, well, we've got this scanned copy of the file. The scanning was done prior to Mr. Mahmoud's visit to look at the evidence, and if you piece together the pages that were found in his cell and the pages that remained at the HHS office, there's a match, and the circumstantial evidence was important to the government because the case agents testified that they did not observe him take anything, and Mr. Mahmoud called his two attorneys at that time. How would he have gotten the exact same documents that were taken from the office? And the fact that they're exactly the same is a pretty strong piece of evidence, isn't it? Well, that is the government's circumstantial case, but it all hinged on the authenticity of Exhibit 351, which they claim is an exact duplicate of the file that they had scanned before his visit. So there's building blocks here, and if we take away the foundation, which we believe is Exhibit 351, then the circumstantial case falls apart or certainly is not at least as persuasive to the jury. And the judge told the government, well, just call an agent who can say, yeah, I saw the scanning being done, and that will be sufficient. So the government said that they would do it, but they didn't do it. The case agent didn't testify from personal knowledge. The other agent didn't testify from personal knowledge. I'm unsure what your argument is. Is it that there was a lack of foundation, or are you arguing that the exhibit is not trustworthy because there's a difference in the two copies? I'm not sure what the argument is. I'm making both arguments. Under Issue 3, we're attacking the admission of the exhibit. Under Issue 2B, which is a sufficiency argument, we're arguing that there's a lack of evidence to support the obstruction because there are such material differences that we're invoking what's called the physical facts rule, that normally this court defers to the trier of fact if there's any evidence, but in cases where the physical facts defy what the government, the prosecution is claiming, the court can reject that testimony. Can I ask you a question? Your client, his citizenship status is what? He's a... He's a Pakistani national. Yes, and his situation in the United States is what? I believe he's a permanent resident. And what happens if his conviction is affirmed? What is his deportation status? Well, it gets a little complicated. I'm not an immigration lawyer, but there's a distinction between offenses that per se result in deportation and then crimes of moral turpitude where there's some discretion on the part of the immigration authorities. I guess it's not anything we should be concerned about, but there have been some cases recently, some in the Supreme Court, about how this should be handled. Yeah, that's true. About deportation. Yeah. Okay, thanks. So I see I have one minute. I would like to touch upon the money laundering convictions. There's been several decisions from this court that have attempted to walk the fine line in separating true money laundering as a separate offense versus money laundering-type activity that occurs during the course of a crime involving fraud. Because by definition, fraudulent crimes involve deception, concealment, and we would submit that even if everything that the government says is true, they have not proved the money laundering counts or conspiracy. What about the part of the transaction where after the money goes to these four corporations, it then goes to these other two corporations and then some of that went into your client's pocket? Like these checks that after the whole Medicaid fraud was completed, the money that was paid to these extra corporations? Well, right. The money went from the home health agencies to the rehabilitation companies, and then checks were cashed to pay the so-called marketers or recruiters of clients. Right, but some of it also just went to your client. Well, I don't think that there was any proof of that. I thought there was like a $5,000 check that just went to him. But then we still don't know whether then that eventually went to the recruiters or not. I know your time is up, but just the sentence in terms of the money, do you have anything to say about that? My counsel for the appellant is going to address that, and I think there's a lot of overlap, but I would just say that the figures were just pulled out of thin air. They just take the gross amount of billings and, well, the entire business was fraudulent, therefore that's the amount of loss. And I would point the court to the Fowler case from the same Eastern District of Michigan, which clearly requires the government to distinguish between legitimate and illegitimate claims. Thank you. Thank you. Good morning, Your Honors. Kasim Daqlala on behalf of the other defendant, Badr Ahmadani. Judges, I do have a lot to say about the amount of loss in this case, and I think pulled out of thin air is a good way to describe it. My client, Mr. Ahmadani, was charged and convicted with two counts in this case. One was health care fraud conspiracy, and the other was conspiracy to pay and receive health care kickbacks. Now, at various times, the court and the prosecution used different numbers as far as the amount of loss attributable to my client. At one point, actually during sentencing, the court used the number $44,881,542.13. The judgment of conviction had the number $38,150,113.64, and there was a forfeiture number that the forfeiture U.S. attorney used of around $32 million. So there is a $12 million spread between a number that the court used at the tail end of sentencing, a number that was used in the forfeiture number, and then the number that was on the judgment was somewhere in the middle. These numbers were pulled out of thin air with respect to both defendants, but with respect to my client, it's clear that there's no basis to come up with that number. Now, I'm going to talk about a company called Hands On Healing. That was the home health care company that was part-owned by my client for a period of about a year and a half, as the evidence showed at trial. It was from 2007 when Hands On Healing got its Medicare provider number and therefore was able to commit Medicare fraud. And August 2008, when Mr. Ahmadani sold his share of the company to Mr. Mahmoud for about $60,000, I believe was the sale price. That's what the evidence was. There's no evidence of my client's involvement in business with Mr. Mahmoud or any other alleged conspirator or any other conduct that could be deemed a conspiracy to commit health care fraud after August of 2008. The only thing that was ever even mentioned by the government on that point was a check, I believe $4,000 alone, I believe in 2009, from one of the companies to Mr. Ahmadani's wife because at the time they needed money to take a trip. There was no evidence of Mr. Ahmadani being involved in anything. And he didn't do any physical therapy? He did nothing after August of 2008? Absolutely not. There was never any evidence of that presented at trial, nor was there any evidence of that presented at sentencing. So after August 2008, it's clear to me that Mr. Ahmadani was not involved in anything that could be termed health care fraud. But in the sentencing hearing itself, it was, I think, clear to the court. Here's what the judge says at sentencing on page 91 of the sentencing transcript, which is about 11 pages from the end. It's after the judge had heard everything that the judge needed to hear at sentencing. And this is in response to Mr. Ahmadani making an argument on behalf of himself. She says, Your lawyer has argued, I think, very effectively that you were not the mastermind of this scheme, but that despite getting so little out of this, you continued in it for a great deal of time until at least 2008. And I don't know exactly what happened in 2008 at this point. So at the end of the sentencing hearing, the judge is saying, I don't know what happened in 2008. So clearly there was no finding, not a finding by a preponderance of the evidence as was the government's burden, that my client contributed in any way to any loss after August of 2008. Now, hands-on healing billed Medicare from its inception until Mr. Mahmoud was arrested in July of 2011, $6,723,828. That was the totality of the billing. We don't know at this point, because facts were not developed at trial or at sentencing, as to how much was billed that my client could have possibly contributed to. But I'll submit to the court that it's got to be, just doing basic math, less than $2 million. And that's going to make a significant impact on what the end sentence becomes if my client is resentenced. Now, he was convicted of two counts. One is the healthcare fraud conspiracy. But he was sentenced way below the guidelines, right? The guidelines were, there was a 10-year maximum on the healthcare fraud conspiracy. My client got eight years. So he got eight years concurrent with the maximum that he got on the kickback count, which he got five years on that. Now, a word on the kickback count, there wasn't anything set at sentencing about that. It was just assumed that he should get the max on the kickback count. There wasn't anything relating to how much he would have received in kickbacks, anything relating to the amount of loss generated by the kickback activity, none of that. So I believe he should be resentenced as to both counts, the healthcare fraud conspiracy and the kickback count. And did you object to sentencing? I was not the lower court. His lawyer. Oh, he represented himself. No, he had a court-appointed attorney. One of my last arguments is an effective argument. But with respect to the issue of sentencing, there was a lot of discussion relating to the amount of loss, and there was an objection filed relating to the amount of loss at sentencing. And, you know, that gets into the analysis of the cases that the court relied upon at sentencing, surrounding the issue of whether there was a withdrawal from the conspiracy by my client, as I'm arguing, and whether it was what the court termed as mere cessation of activity. And I think in the context of the facts of this case, based upon the case law that we've cited in the brief, which the government doesn't respond to in any way, is that my client withdrew from the conspiracy because the instrumentality of committing the fraud, that is, the ownership and participation in a home healthcare business, stopped. There's no evidence that it continued after August of 2008. And there was no allegation that the transfer, I mean the sale, was less than an arm's length transaction? No. No. I mean, there was a sale of the business. My client got out of the home healthcare business. I understand that. I'm just saying he got out of the business in an arm's length. There was no allegation that this was something other than a straight sale. As a sham transaction? Absolutely not. There wasn't even an allegation of that. Certainly no evidence of that. And so there's a case I want to point to from the Second Circuit. It's called Nurlinger. It's cited in our brief. And in Nurlinger, there was an investment fraud that was being perpetrated. And the defendant in that case argued withdrawal, and the Second Circuit agreed that there was a withdrawal when he closed his account at the investment firm that was used to perpetrate the fraud. They said that is withdrawal from the conspiracy. All liability gets cut off at that point. The Sixth Circuit has approvingly cited to Nurlinger in United States v. Lash. That's a 1991 case which we cite in our brief. Now in Lash, and I see that I'm out of time, but if I could just finish this one point. In Lash, the court said that the defendant in that case, although he was arguing withdrawal, continued acquiescence with the conspiracy after the point of the alleged withdrawal from conspiracy. There are no facts to indicate that in this case. So based upon that, I think if you find that after August 2008 there was a withdrawal from conspiracy, that for sure cuts off my client's liability for any losses after August 2008. What did the trial judge say about that? This again goes into a little bit of the ineffective argument that I made. The lawyer for my client in the lower court didn't cite to either Nurlinger or Lash. There was discussion about cases which I find inapplicable, which I analyzed in my brief, a case called Patel, a case called Mahmood, no relation to his. The lawyer said my client's involvement stopped in August of 2008 or not? Very clearly, very clearly. And how did the judge respond to that? The judge said that's mere cessation of activity that doesn't qualify as withdrawal. Okay. And under case law, that's just incorrect. That was clearly erroneous. But isn't there some requirement anyway that she find that your client had some knowledge and should have anticipated or had reason to be? I mean, there are criteria that you have to apply to a co-defendant before you can charge that co-defendant with all the losses caused by the other co-defendant, right? Absolutely. There has to be some nexus between my client's... And did the judge engage in that analysis? No. The court just said that they were, you know, entwined with one another. Therefore, you get all the losses. Okay. All right. Thank you. Thank you. Good morning, Your Honors. My name is Dan Hurley and I represent the United States. On that point, the standards in 1B.1.3 of the guidelines, it says you're responsible for the actions of a co-defendant or a co-conspirator if it is within the scope of a jointly undertaken activity. That's the standard under the guidelines. That's the standard the district court applied here. What was the scope of the jointly undertaken activity? It's a false premise to say that Mr. Almodany's role was limited to his ownership of hands-on healing. The testimony showed that everything they did was fraud, that the fraud was well underway before hands-on healing received the Medicare provider number. The Medicare provider number itself was procured by fraud because Tauseef Rahman and others testified that they were having recruiters bring in patients and as soon as you're paying for a patient, everything that happens downstream from that in terms of submitting it to Medicare is fraudulent. What was his participation or his activities after August of 2008? Because the cooperators that the government was able to convince to testify for the government were only there prior to that period. There's no testimony from anyone in the scheme after that date. So the district court is faced with overwhelming evidence that everything they did was fraudulent. They bought the patients. They paid the doctors, illegal. The doctors didn't really see or examine the patients. But what's the evidence? I mean, did you say there was no testimony after 2008? That's right. So how do you – and I think what Judge White is asking is what I'm interested in. If that's the case, how do you attribute the fraud to the seller post-2008? Because the selling of the business is a red herring. Because his liability is not as the owner of the practice. His liability is there's testimony he was getting cash from ATMs to pay for the patients. He admitted to the agent that they paid for patients. The claims were fabricated. His name was on many of the fabricated patient files. But you have – I'm really confused. You have no evidence from 2008 to the time that you raided the office? Bills were submitted. So we have evidence that payments from Medicare were going to this conglomeration of companies. Ahmadani's involvement was not limited to hands-on healing. He was also involved – the records showed that the majority of his billings went through the patient care home care company, which was one of Mehmood's primary vehicles for fraud. The evidence also showed that patients were handed off as part of the scheme that they talked about. They were handing patients from one company to another. The companies all had interrelated payments from Medicare through this nest of companies. So Judge Levy is faced with a situation where no cooperator after 2008 was able to say Ahmadani did this, Mehmood did that. But aren't certain things signed by him? We don't have anything in the record that shows that he signed a particular file after 2008. But Judge Levy is faced with – The evidence is consistent, at least, with the idea that he completely withdrew from the conspiracy, although – I think it's neither – Who knows? It's neither consistent or inconsistent. And so, as I started to say, this is Judge Levy's situation. It is – Should we – what is the basis for our believing that it continued? Judge Levy is faced with everything they did was dishonest. They admitted that it was dishonest in terms of buying patients, paying doctors, fabricating charts, etc. Before this time. In total. That there is – there's no reimbursement from Blue Cross. There's no testimony that a patient came in without being paid to come in. There's no testimony that any doctor ever legitimately – There's testimony – okay. who needed it. There's that testimony. There is a little of that. Okay. And then there's also your expert testimony that 90% was fraudulent. I mean, that was a rough estimate. Okay. So that's – both of those is testimony that it wasn't – that all of the services weren't fraudulent. Now, you want to say that it's all fraudulent because, in effect, whenever you defraud the payer, Medicaid or anyone else, they wouldn't have licensed you if they knew that you were going to commit the fraud, so the whole thing is fraudulent. We're saying more than that, Your Honor. If you pay for the patient or if you pay the doctor or if the doctor doesn't issue the certification requiring that you needed home-based care and if the doctor doesn't exercise legitimate medical judgment that you need the physical therapy, whether you got physical therapy – and that's a very, very, very small slice with no numbers put to that – that's irrelevant because Medicare says if you pay for patients, we're not willing to pay for that. Even if you provide the best care in the world, the patient was obtained in violation of the regulations. That's the scheme in Count 6. And so it doesn't matter unless that patient walked in off the street, saw an ad on TV, came to them without being paid, through recruiters not being paid. They were seen by a legitimate doctor, not a doctor who signed forms in blank without dates, not a doctor whose signature was photocopied. If that were true, then they would be entitled to an offset. And the value of that reimbursement should not count as a loss amount. But there's just – there's nothing to suggest – 90%. I mean, that's obviously a very rough estimate, but of that 90%, some of the other – some of the money was actually intercompany. There were two witnesses. One was – I think it was Sib Ahmad. One of the witnesses did say roughly 90%, but there's nothing to back that up. We don't know where those numbers came from. But even if that's true, there is such a cushion above the $25 million cutoff that if the district court said, okay, they billed $44 million, the intended loss is $40 million or $39 million, they're still way above the cutoff. Right, on the scoring but not on the restitution. That's true, Your Honor. What the district court was faced with is everything is fraudulent about this. And it's rampant and it's going across multiple companies. They're handing patients off. Everything they touch starts with fraud. Every step of the way is fraudulent. And then the government shows up in 2011. Money has continued to flow to this network of companies. And in 2011, the same – some of those same companies are still billing. There are still checkbooks. Seen on the desks of the offices when they executed the search warrants. And there's a nest of phones that have company names on them. That they're running eight or nine businesses all from the same desk. But you know that Mahmoud is still involved, right? That is the inference the district court drew. And we think that's a reasonable one. Well, but you don't know that the co-defendant is still involved. That's right, Your Honor. With respect to Ahmadani, the district court found that under the rules of 1B1.3, the scope of the jointly undertaken activity is this network of companies that submits fraudulent bills to Medicare. But you don't know that he was still a part of that network. That's right, Your Honor. The district court instead took its guidance from this court's case in Patel where the court said for guideline purposes, if the scheme is still going on, and the law is black letter law, that once a conspiracy is underway, it is presumed to continue unless there's affirmative noisy withdrawal, which is not what happened here, or this conspiracy achieves its objectives, or it's frustrated by law enforcement, that it ends when someone is arrested. That happened on November 3rd of 2011. And under that principle, Mr. Ahmadani remains responsible. The company he set up was still billing Medicare. But he didn't own it anymore, and there's no evidence that he was still involved. I agree, Your Honor. That's the principle that the district court applied. It thought it was applying the correct principle. If the court sees it otherwise, then obviously we're open to have our... How much difference does that make? We don't know, Your Honor, because we didn't, at sentencing, the parties didn't break down this much came in in 2009, this much came in in 2010, this much came in in 2011. So that would be something that would have to be investigated on remand as to what amounts were attributable to which time period. For Mahmoud, we think that the evidence is strong that he continued all the way through 2011. Even if he didn't, the Duane case makes clear that he gets the guideline applicable to the time of his later committed offense. And so for Mahmoud, none of this makes any difference for both of those reasons. For Ahmadani, it does. I'm sorry. No, I'm sorry. So can you walk me through the basis for admission of... What is the exhibit, 851? 351, I believe. Okay. So walk me through the foundation. The foundation really rests on the totality of the circumstances, which is permitted under 901, I think it's B-4. There was testimony from Agent Greziak, I believe it was. Just one second. The objection was made under what rule? I don't know that they cited a rule, Your Honor. What I recall is the objection was, this is really important. If they get this in, it proves my client's guilt. But there was no detailed analysis of under the rules of evidence. Well, they were asking, I think they wanted foundation. They wanted chain of custody. They wanted to know that this stack that purported to be the original stack was really an exact copy of what had been seized, right? I don't know what they're... I don't want to make the argument for them. I don't understand what the objection was. Because the government said, look, we seized this. But it wasn't what they seized. It was a copy. Right, they seized the original records. And those are pre-printed forms with handwriting on them. Patient came in on this day. I had them do these exercises. Signed by the patient. Signed by the physical therapist. So those are pre-printed forms and various sharp items. The testimony was that a paralegal came out to Detroit and scanned them. And the agent was asked, here is a printout. Wait, wait, I'm sorry. So the testimony, where is the testimony? So my recollection is that Agent Gryziak testified, and this is going to be in R-322. They talk about seizing. What page are you on? I'm sorry, 9-2-0-8 and 9-2-0-9. They talk about what they seized. And then they took a break. And then they introduced, these are the charts showing that they're doing the multiple billing. And then Agent Gryziak testified at 9-3-3-0 in R-322. The agent was handed the Exhibit 351 and was asked, what is this? Do you recognize this? And he says, yes, I recognize that. And that is, he didn't say it this comprehensively, but he was effectively saying it. He says it's her patient file. Right. And when he met her through a search warrant. It's a printout of what we scanned from what we seized at the time of the search. Which had been in government custody until the date that Mr. Mahmoud came to look at the records. That's sufficient foundation because that's been in government custody. And Mr. I'm sorry, Counsel for Mr. Mahmoud says, well, you can only use a copy if there's a genuine question. Well, at that point in time, there was no genuine question. I'm sorry. So at 9-3-3-0, he says that's a scanned copy. Right. And then at 9-3-4-4, he says that it was scanned before Mahmoud came to visit the office. And there's other testimony that that scanned copy had been produced to the defense before Mahmoud came to the office. One of Mahmoud's attorneys, John Minnick, specifically asked, is this the one that we got on, I think it was May 23rd of 2014. And he said, well, I'm not sure what you got, but a fair reading of that is that the defense knew they got the scanned copy of the original records. Mahmoud gets access to the original records. The agents look at them as they put them back on the shelves the next day. And they notice the part of the file that had caused them to scan it in the first place. Not all the records were scanned. Only some of them. This was primary among them because it had the damning patient files. Because it had the note saying, we need to change this. We need to doctor up records. Generate the paperwork that makes it look like we knew she was admitted to the hospital. And then generate the ROC, which is the resumption of care. Which is the form that would be used when the patient would get out of the hospital. So there's a note on the file that says, these dates don't work. That's exactly why they copied it. That's how the agent could recognize when he looks at 351, that's in the front. It's those very papers. And those papers have great significance to him as an agent. And then they look for them. They're no longer in the file. So they look in the cell. And lo and behold, original paper files. Not copies, not photocopies. The original papers that were the preprinted forms with the handwriting on them saying, I saw her on this date. They were in Maymood's cell. Irrespective of 351, if there had never been a scanned copy, under the Jackson v. Virginia standard, there's more than ample evidence to infer that Maymood took that. If an agent says, this file had that piece of paper at the front of it, and Maymood leaves and it's not at the front of it, and they go to Maymood's cell the next day, and there it is, a reasonable jury could absolutely find that Maymood stole it. Particularly when you think about how incriminating those particular pages were. In addition, Maymood had other patient files. He didn't have a volume of files. He didn't have complete original records. But he had a few original pages from medical charts. And every original page he had from a medical chart corresponded to a file that he had reviewed at the offices. The reasonable inference is the papers in his cell came from the charts he reviewed. That's all the government asked the jury to find. That's certainly sufficient under the Jackson standard. With respect to 351, we think it was properly admitted. But didn't they argue that we want to know who scanned it because we don't believe that this was originally missing? Well, I mean, we don't think this was originally there. They never went that far, Your Honor. They did say we want to know who scanned it. And obviously, I'm not saying that it wouldn't have been helpful to have had that person. But the question at this stage is, did the government need that person to testify? And this Court has many cases suggesting that for chain of custody, there can even be holes in the chain of custody. There can be gaps. But there's no question. We seized the originals. He had access to the originals. And a part of it was missing. He knew it. The agents knew it. His lawyers knew it. And there's no genuine question. Today, I heard there were multiple originals. That there were multiple pre-printed forms with pen and ink, signatures and notes about it. I had the patient extend their leg this way. Is the legal issue here whether the preliminary finding that would give rise to the courts admitting the evidence, whether the preliminary finding is accurate? Is that the legal issue? That's what it should be, Your Honor, is did the district court have a sufficient basis to conclude that the jury could accept it for what the government was representing it to be? And that's a low standard. It's not reasonable doubt. It's not even a preponderance standard. It's just a basis that the jury could accept it. And based on the testimony of the agent. It's a finding that the district court must make in order to permit the evidence to go forward. That's correct. And this Court did make that finding. This Court said, I accept it. And we still haven't heard. It's kind of a moving target here. Were there two originals? Was this not part of it? Did he have it? I don't know what their theory is. The rule about copies only comes into play if there's a genuine question. And I don't know what that genuine question is. The agents had seen the pages that say, fix the chart. That's how they knew it was missing. The question before us on appeal about this is whether the district court's finding, not beyond a reasonable doubt or perhaps not even a strong probability, the question is whether the district court's finding is reasonable. Right. Whether it was an abuse of discretion. I see that my time is up. Unless the panel has any other questions, we're prepared to rest. Thank you. Thank you. Briefly, regarding the abuse of discretion, the judge said, I'll be satisfied if the agent says that he witnessed the file being scanned. Therefore, you wouldn't have to bring in the paralegal if you get that testimony. But the government didn't do it. And so the district judge made a ruling that was contrary to the foundation that she expected from the government. There was no message, doctor this. It was, fix this, which is shorthand language that is just as consistent with, okay, let's correct this billing. Medicare has rejected it. One final point I'd like to make is this. The indictment, the health care fraud conspiracy, alleges that the offense occurred between 2006, 2011. The government called four cooperating defendants who all left in either 2007 or 2008. So that leaves at least a three-year time gap. But the defense covered that time period, the time period that the government did not cover. The defense called seven witnesses who were never cross-examined regarding their honesty, who testified that they rendered legitimate services and what they observed in the home health care agencies seemed legitimate. So that's certainly, even Mr. Mahmoud, if you were to affirm his convictions, he's not responsible for this gross amount of billings as loss because much of that loss has not been proved to be rooted in illegitimate claims. Thank you. Thank you. Just real briefly, on the issue of how much of the home health care businesses were fraudulent, the government had a star witness, Talsif Rahman, who was like the Michael Jordan of cooperating witnesses in health care fraud. I mean, he's testified in so many trials prolifically to the point where I read a sentencing memorandum that the government filed on his behalf, and gushing is an understatement. And even Mr. Rahman testified at trial that 80 percent, he estimated, of what went on in these companies was fraudulent. He didn't say all of it was. So even in the government's best light, we're talking about 80 percent. So the number can't be the gross amount. Now, the government talked about a conglomeration of companies. There were 14 home health care businesses. I think the evidence showed that Mr. Mahmoud had a hand in as part of this alleged fraud. My client was only ever involved in hands-on healing. That was the one company. Whatever went on in these other companies, he didn't have anything to do with it. And I think that's further bolstered by the government's argument that there was this handing off of businesses or files between businesses. My client had nothing to do with that. His signature did not appear anywhere. There was no evidence that he even knew what was going on in 13 other companies that contributed to this $44 million alleged loss. I want to talk real briefly about the issue of severance. I detail it in my brief. But my client could never, I think, get a fair trial in this case without a severance between him and... But that's not what he asked for. That's not what he asked for. He asked for a severance of account, which that plays into my ineffective assistance argument that clearly the disparity in conduct that was alleged in this case is so vast. And you can't expect a jury to sit there for three weeks and hear all of these things. That will have to be taken up in another proceeding for ineffective assistance of counsel. Unfortunately, because of the timing of how I ended up getting involved in this, I wasn't able to file a motion or anything like that. I got involved in this case after the court-appointed lawyer had filed the claim. It's a hard case for... Well, you have habeas. Thank you. This wasn't a criminal justice appointment, was it, for either of you? No. Okay. Oh, thank you. We appreciate it. I'd like to ask government counsel one question that I'm just curious about. What is the policy on deportation now that where you have... Do you know? I don't know, Your Honor. I'm sorry. I don't know. Okay. Yes. Yes. Thank you. Hard case. Thank you. All of you will be submitted. Thank you.